OPINION
Karam K. Pathan, Defendant-Appellant herein, is appealing from the decision of the Common Pleas Court of Montgomery County, Ohio, Division of Domestic Relations, which maintained Merry Pathan, Plaintiff-Appellee herein, as the residential parent and legal custodian of their minor child, Sabina Pathan. The trial court found that a change in circumstances had occurred due to Merry's interference with visitation between Karam and Sabina, but that it would be in Sabina's best interest for custody to remain with Merry. Karam asserts six assignments of error.
Merry's brief does not contain a statement of the case nor a statement of the facts, thus under App.R. 16(B), we can infer that Merry is satisfied with Karam's statements of the case and facts. Our review of the voluminous transcript and record before us reveals the following pertinent facts as stated in Karam's brief, with some modifications, upon which we base our opinion.
Karam, a native of Pakistan, and Merry were married in Dayton, Ohio on November 2, 1985. During the marriage, the parties resided in California. One child, Sabina, was born to the parties on December 1, 1989. The couple obtained a dissolution of their marriage in Los Angeles, California on June 2, 1993. During the separation, Merry returned to Dayton, Ohio with Sabina. At the time of the hearing on Karam's motion, Merry was a music teacher for Twin Valley Local Schools, and she resided in Brookville, Ohio, with Sabina. Karam resided in La Mirada, California in the former marital residence. In 1993, Karam had married Rebela, Karam's first cousin and a native of Pakistan who came to the United States in February of 1994 after her marriage to Karam. Rebela and Sabina have enjoyed a comfortable relationship.
The dissolution decree incorporated by reference an agreement of the parties, entered into on May 15, 1992, that stipulated to custody and visitation. This agreement provided that Merry would be designated as the residential parent and legal custodian of Sabina, and Karam would be given "reasonable visitation" of Sabina. Visitation was modified by the California court on December 7, 1995, once Sabina became of school age. The 1995 California order was registered with the Montgomery County, Ohio, Domestic Relations Court.
Prior to mid-1994, the parties had reached common ground regarding Karam's visitation with Sabina. Merry had accompanied Sabina on visitation activities with Karam, picked up Karam from the airport on his visitation trips to Ohio, loaned Karam her car during some of the visits, and allowed Karam very liberal phone contact with Sabina. Problems began when, in mid-1994, Merry learned of Karam's marriage to Rebela. These problems were serious enough to necessitate court intervention for compliance with the visitation schedule because Merry began interfering in Karam's phone conversations with Sabina. Merry had removed Sabina from the home during scheduled phone conversation times and had made excuses for why Sabina could not talk on the telephone to Karam. Merry also interrupted several of Sabina's telephone conversations with Karam and then proceeded to argue with Karam in Sabina's presence.
On July 29, 1996, Merry filed a motion to terminate visitation. A pre-hearing on this matter was held on November 13, 1996, during which it became apparent that Karam was planning to file a motion for change of custody. As a result, Dr. Rebecca Hannah was appointed as the trial court's expert to conduct a custody evaluation and to make recommendations to the magistrate. Custody hearing dates were set and the parties agreed to not discuss the case with Sabina or attempt to influence her residential preferences.
On December 5, 1996, Karam filed a motion for a change of custody, alleging that Merry had denied him access to Sabina, and that Merry and her relatives had subjected Sabina to physical and mental abuse. Karam argued that such actions were detrimental to Sabina's well being, and that a change in custody would be in her best interests. Numerous motions were filed on behalf of the parties regarding the custody litigation. The matter was heard before a magistrate on September 22, 23, 25 and 26, 1997, and February 23 through 27, 1998. Both parties were present for all hearing dates.
At trial, much of the testimony surrounded the difficulties in visitation, the strained relationship between the parties, and their inability to keep their conflicts separated from Sabina. Karam produced evidence that he and Sabina had experienced a good relationship, and that Sabina had been loving and affectionate towards him. It is important to note that Karam, although not entirely blameless in the matter, had allowed Sabina and Merry to communicate daily by telephone during Sabina's visits to California. Conversely, Merry tried to portray that Sabina was frightened by Karam. At trial, Merry produced a videotape taken at her home showing Sabina lying on the ground in a state of distress, pleading not to attend visitation with Karam. However, another video was admitted into evidence depicting the visitation exchange several hours later, showing Sabina hugging Karam and happily getting into his car for the visit.
There is evidence in the record indicating that Merry had related several facts to Sabina in order to cause her to think less of her father. Merry had stated to Sabina that Karam was not present at her birth, and that Karam had had a preference for a son.
Merry's desire to further alienate Sabina from Karam was evidenced in the situation surrounding Sarina's schooling. Merry enrolled Sabina in Salem Christian Academy. Merry testified that this was done not to create a conflict with Karam's Muslim faith, but because Merry had previously taught there and she knew it was a safe environment for Sabina. However, upon enrollment, Merry completed the information form and placed a large "N/A" in the location for information about Sabina's father. In the blank which requested information as to with whom the child resided, she placed the words "Mother only" and underlined "only" three times. She also failed to provide any other information about Karam on the form. As a result, Karam found it difficult to obtain information from the school.
Both parties acknowledge that Merry's sister showed the movie "Not Without My Daughter" to Sabina. The movie is a true story of an American woman married to a physician who was Iranian, but who practiced in Michigan. The characters in the story have one child, a young daughter. The physician asks the wife to accompany him to Iran for a family vacation, and while there, it becomes clear to the wife that he intends to remain there. In the film, the father beats and imprisons the mother. The film graphically depicts the cultural differences between Iran and the United States, particularly in the differences in the treatment of women and children. The general feeling from the movie is hatred and great trepidation toward the culture and the physician. The story is remarkably similar to Sabina's situation with her physician father from a similar national origin, and a mother and child with whom Sabina could identify.
Merry also subjected Sabina to unnecessary drug testing at Children's Medical Center both before and after a weekend visit with Karam. This was based upon Merry's belief that Sabina returned from a visit "acting like a zombie" and that she must have been drugged by Karam. This action was done in hopes of obtaining evidence damaging to Karam.
The court-appointed psychologist, Dr. Hannah, testified about the custody evaluation she conducted upon agreement of the parties. After interviewing and testing Merry, Karam and Sabina, Dr. Hannah produced a report to the trial court recommending that custody remain with Merry, and which was fairly negative toward Karam. A good portion of Dr. Hannah's testimony surrounded the standardized testing which she performed upon Karam. Dr. Hannah acknowledged that none of the tests had been adjusted to account for Karam's Pakistani ethnicity, and in fact there had been no statistical attempts to standardize the MMPI II for individuals with Karam's ethnicity. Instead, Dr. Hannah stated, she took his ethnicity into account when she evaluated him under the total testing evaluation.
Dr. Hannah's report indicated that Karam had engaged in conduct designed to alienate Sabina from Merry. She also diagnosed him as having a depressive disorder and a paranoid predisposition. In part, Dr. Hannah based these diagnoses on Karam's beliefs that Merry interfered with his telephone contact with Sabina, that she was on a "rage of vindictiveness" to block visitation between Sabina and Karam, and that she had enrolled Sabina in a Christian school to spite him.
Upon completion of Dr. Hannah's report, Karam requested that a guardian ad litem ("GAL") be appointed to the case. Barry Galen, Esq., who was appointed as Sabina's GAL, found that both parties had seemed to "lose sight" of reality and involved Sabina in their conflict, as evidenced in the recurring problems with visitation and telephone contact. Mr. Galen also noted that Sabina was bonded with both Merry and Karam, however he recommended that Sabina remain in the custody of Merry. Mr. Galen concluded that there had existed a great deal of emotional strain upon Sabina as a result of her parents' struggles and miscommunication, however, he could not determine how a change in custody would resolve the problems. Further, Mr. Galen had grave concerns about how a change in Sabina's life, school, and residence would affect her.
On December 8, 1997, Karam filed a motion requesting that Dr. Phillis Kuehnl, Ph.D, be appointed to determine if Karam had engaged in conduct designed to alienate Sabina from Merry. Instead, and upon the suggestion of Merry's counsel, Dr. Richard Gardner was appointed for the limited purpose of determining if Sabina suffered from "parental alienation syndrome" ("PAS") resulting from conduct of either parent intending to cause Sabina to fear or despise the other parent, or to otherwise cause damage to the relationship between Sabina and the other parent. Although he did not render an opinion as to custody, he found that any alienation induced by Karam was mild[1] to non-existent. Furthermore, Dr. Gardner found that Merry had induced a moderate amount of alienation in Sabina, based upon her course of conduct in discouraging all forms of contact with Karam, excluding Karam from Sabina's school enrollment forms, and seeking to gather negative information about Karam. Additionally, Dr. Gardner stated in his report that he believed that Merry was a "child abuser."
The magistrate filed his decision and permanent order on March 27, 1998. He first concluded that a change in circumstances had occurred since the previous custody order, specifically that Merry had engaged in conduct involving psychological abuse and active interference with visitation and telephone contact. The magistrate also determined that a serious problem existed with respect to the way Merry had handled her status of being Sabina's residential parent. Nonetheless, after performing a thorough analysis of what would be in Sabina's best interest under R.C.3109.04(F)(1), the magistrate concluded that the harm which would be caused to Sabina by a change in environment was greater than that which would be caused by retaining her present residential status. Specifically, the magistrate acknowledged that Sabina and Merry shared a close bond, Merry had been her primary care giver, and that Sabina was well-adjusted to her extended family and her school. Because of this, uprooting her from this situation and placing her in California would be more harmful than advantageous. However, the magistrate noted that there was evidence presented that Merry had participated in psychologically abusing Sabina, and he ordered specific changes to occur regarding the visitation arrangement. The magistrate noted that if such changes did not occur, Sabina's best interests would be served by a change in custody in the future.
Karam filed his objections to the magistrate's decision on April 8, 1998, and he supplemented these on November 30, 1998. Merry filed cross-objections on April 10, 1998, and supplemented her objections on November 13, 1998. The trial judge filed his decision on March 17, 1999, finding that the magistrate's decision to maintain custody with Merry was "not inappropriate" based on the strong bond Sabina had with her mother, and that the harm of disrupting her life in Dayton and relocating her to California would outweigh the benefits of such at this time. Additionally, the trial judge scheduled a review hearing to ensure that consistent visitation would occur between Karam and Sabina. The trial judge noted that if Merry continued to engage in a destructive pattern of behavior, and if it was determined that Karam would better be able to follow the court's orders, it might, in the future, be in Sabina's best interest for the court to grant Karam's request for a change in custody.
On April 14, 1999 Karam filed his notice of appeal, asserting six assignments of error. We will address Karam's first, second and fourth assignments of error together as they are interrelated.
I.
 The trial court erred as a matter of law when, after determining that a change in circumstances did occur, it failed to determine the best interests of the child pursuant to ORC 3109.04.
 II.
 Although a change in circumstances did occur based on Appellee's intentional interference with the relationship between Appellant and Sabina, the court erred as a matter of law and abused its discretion by requiring a higher burden than necessary pursuant to O.R.C. 3109.04. Specifically, the court over emphasized the finding that the harm likely to be caused by a change of environment outweighed the advantages of a change in custody of the child in light of the fact that the court also warned Appellee that continuing her behavior would result in a change of custody in the future.
 IV.
 The trial court abused its discretion when it failed to grant Appellant a change in custody because of finding that the harm likely to be caused by a change of environment outweighed the advantages of the change in custody of the child when the evidence, as a whole, clearly indicates that a change in custody is necessary to protect the best interests of the child.
In these assigned errors, Karam asserts that the trial court neglected to address the enumerated factors under R.C.3109.04(F)(1) in deciding the issue of Sabina's custody. Karam further argues that the trial court erred in its determination that maintaining custody with Merry would be in Sabina's best interests, and that the trial court over-emphasized its finding that the harm of changing custody to Karam would have been outweighed by the benefits. For the reasons that follow, we overrule these assignments of error.
We note that a trial court's custody determination in a domestic relations case that is supported by competent, credible evidence, will not be reversed absent an abuse of discretion.Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, syllabus. The term "abuse of discretion" implies more than an error of law or judgment, it connotes an attitude on the part of the trial court that is arbitrary, unreasonable, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. With regard to the review of custody matters, the Ohio Supreme Court has stated the following:
 The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. (Citations omitted.)
Miller v. Miller (1988), 37 Ohio St.3d 71, 74. See also, Reynoldsv. Goll (1996), 75 Ohio St.3d 121, 124; Meyer v. Anderson (April 18, 1997), Miami App. No. 96CA32, unreported. We remain mindful of these principles as we address the merits of Karam's assignments of error.
R.C. 3109.04(E)(1)(a) governs the modification of child custody arrangements. That section provides, in pertinent part, that:
 The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, [or] his residential parent * * * and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless a modification is in the best interest of the child and one of the following applies:
 (i) The residential parent agrees to a change in the residential parent * * *.
 (ii) The child, with the consent of the residential parent * * *, has been integrated into the family of the person seeking to become the residential parent.
 (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.
Thus, R.C. 3109.04(E)(1)(a) creates a rebuttable presumption that it is in the child's best interest to retain the residential parent as designated by the prior decree. This presumption must be overcome by the trial court's finding, by a preponderance of the evidence, that a change of circumstances has occurred, that modification is in the child's best interest, and that one or more of the three conditions in the statute has been satisfied. In this case, it is uncontested by the parties that there has been a change in circumstances. The dispute lies in whether a change in custody would be in Sabina's best interests, and whether the harm of modifying the custody arrangement would be outweighed by its advantages.
To begin, we do not agree with Karam that the trial court neglected to address the best interest factors under R.C.3109.04(F)(1), and we do not agree that the trial court erred in its determination that maintaining custody with Merry would be in Sabina's best interests. R.C. 3109.04(F)(1), in its entirety, reads as follows:
 In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
(a) The wishes of the child's parents regarding his care;
 (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 (c) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;
 (d) The child's adjustment to his home, school, and community;
 (e) The mental and physical health of all persons involved in the situation;
 (f) The parent more likely to honor and facilitate visitation and companionship rights approved by the court;
 (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 (h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent acted in a manner resulting in a child being an abused child or a neglected child;
 (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent his or her right to visitation in accordance with an order of the court;
 (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.
In considering "all relevant factors" under R.C. 3109.04(F)(1) to determine the best interests of the child, the trial court "is only required to find that they preponderate in favor of change to a degree sufficient to overcome the statutory presumption that a change in the designation of the residential parent does not advance the best interest of the child." Meyer, supra, citingMadden v. Madden (June 14, 1996), Montgomery App. No. 15576, unreported. Although the trial court did not specifically state that it had considered every individual factor enumerated in R.C.3109.04(F)(1) in reaching its determination, we must presume, in the absence of evidence in the record affirmatively demonstrating the contrary, that in determining that it would be in Sabina's best interest to maintain custody with Merry, the trial court did follow the law and did consider those relative factors. Meyer,supra; Ingle v. Ingle (Nov. 16, 1994) Clark App. No. CA-3096, unreported. Moreover, the court's express findings reflect a consideration of the substance of a majority of the factors under the statute.
As for the first factor to be considered when determining the best interest of the child, it is clear in the record that both Merry and Karam had indicated a desire to be Sabina's residential parent.
The second factor requires that the trial court consider the wishes and concerns of the child. Although no in camera interview of Sabina occurred, the trial court, in its decision, noted that Sabina had spoken of her wishes to her GAL. Mr. Galen had testified that on different occasions, Sabina expressed the desire to live with her mother, her father, or both parents. Thus, in making a determination of what was in Sabina's best interests, this factor did not weigh heavily in favor of either party.
The next applicable factor, Sabina's interaction and interrelationship with her parents and any other person who may significantly affect her best interest, was also closely examined by the trial court. The trial court and Mr. Galen noted that Sabina and Merry are well-bonded. However, as noted in both the magistrate's and the trial court's decisions, much of Merry's conduct is "contrary" to Sabina's best interests. Although Merry's relatives in the Dayton area have perpetuated Merry's negative influences in trying to create stress and conflict in Sabina's relationship with Karam, the trial court found that Sabina had an active relationship with her relatives in the Dayton area.
The trial court also noted that Sabina and Karam interact well, participating in many outings and games when they are together. There is additional evidence in the record that Sabina and Rebela have enjoyed a healthy relationship. In evaluating the relevance of this factor in terms of Sabina's best interest, it would appear that Sabina had formed strong bonds with the members on both sides of her family, despite conflict and Merry and her family's tendencies to use Sabina in their conflicts.
The fourth factor relates to Sabina's adjustment to her home, school and community. The trial court found that Sabina was well-adjusted to her home and her school in Dayton. She had many friends and had been performing well at school. Therefore, despite Merry's actions, the fourth factor considered in determining Sabina's best interests does not support Karam's claim that the trial court erred and abused its discretion in maintaining Merry as the residential parent.
The fifth factor addresses the mental and physical health of all parties. The magistrate and the trial court noted that ongoing concerns have existed regarding the mental health of all
parties involved. In summing up the psychologists' opinions, it was found that the professionals questioned Karam's and Merry's mental stability regarding their actions resulting from their conflict, and how they have used Sabina in that conflict. Dr. Hannah diagnosed Karam with a depressive disorder, found him suspicious and guarded, and believed that he could have anger and intolerance problems which would negatively impact his decision making and ability to cope. However, as noted by the trial court and the magistrate, Karam's frustrations were "understandable" in light of Merry's antagonistic behavior. However, the trial court specifically noted that Karam's approach and involvement with Sabina in the family counseling sessions with Dr. Hannah was less than perfect. During these sessions, Karam controlled Sabina's behavior, discouraged her impulses, and continuously prompted her to state that she would prefer to live with Karam in California.
The record and portions of the trial court's decision reiterated that although Dr. Hannah found Merry calm and rational, she discovered that Merry was psychologically immature, over-emotional and impulsive, all of which could negatively impact her ability to parent Sabina. Dr. Hannah noted that Merry was actively involved with Sabina during the family counseling sessions. Merry would redirect some of Sabina's behavior, and she would interact with Sabina in an affectionate manner. Dr. Gardner, in his evaluation, found Merry to have engaged in a form of "child abuse" based on her behavior of placing Sabina in the midst of her conflict with Karam.
Also, important to this case is Sabina's mental health. She was found by Dr. Gardner to be a victim of PAS. During his evaluation of Sabina, Dr. Gardner found Sabina had been playing one parent against the other, had engaged in silence as a mechanism to adapt to the family conflict, and had sometimes refused to speak to Karam on the telephone while in Merry's house. Additionally, Dr. Gardner found that Sabina suffered from anxiety and an artificially low I.Q. as a result of the PAS. Mr. Galen found that Sabina suffered from emotional strain as a result of her parents' struggles.
Thus, in evaluating this factor in the determination of Sabina's best interests, and in light of Dr. Hannah's apparent conflict with Karam, this factor would not seem to weigh in either party's favor.
It is clear, in evaluating the next factor, that Merry has been the primary offender in continuously and willfully denying and impeding Karam's visitation with Sabina since Karam's remarriage. The trial court found that Merry had unreasonably limited telephone visitation and had generally discouraged Karam's relationship with Sabina. The trial court noted that even Sabina's first grade teacher was aware that Merry did not like Sabina visiting with Karam. The record is abundant with evidence of Merry discouraging and interfering with Karam's visitation, both in person and by telephone. As the trial court noted, the problems ranged from intentionally leaving home when Karam called during scheduled hours to not placing Sabina on the telephone and offering to him a weak excuse for her not speaking, to Merry hanging up on Karam when he did call. Thus, this factor weighs heavily against Merry.
In evaluating whether either parent has established or is planning to establish a residence outside of Ohio, it is clear from the trial court's and magistrate's decisions that both parents appeared to have established permanent residences in their respective communities, and this factor is of no great concern. Furthermore, the magistrate found no risk of Karam "abducting" Sabina outside the country. Consequently, this factor does not weigh in favor or against either party.
It is clear that the trial court did directly address the majority of the factors involved in the best interest determination, contrary to Karam's allegations. Looking at these factors, it was not unreasonable for the trial court to find that it would not be in Sabina's best interest for custody to be changed to Karam, despite Merry's interference with Karam's visitation and relationship with Sabina. After comparing the extensive evidence produced at trial with the statutory factors to be considered in determining Sabina's best interest, we find competent, credible evidence does exist in the record to support the trial court's decision to maintain custody with Merry, and we cannot find that the trial court abused its discretion in doing so.
However, this case turns on the determination of whether the harm of changing custody to Karam would have outweighed the advantages of the change in environment. We are unable to find merit in Karam's allegations of error related to the trial court's "over emphasis" of this factor in its determination of custody. We further are unable to find that this decision constitutes error by not reflecting Sabina's best interests.
In evaluating whether the harm of modifying the custody arrangement would have been outweighed by the advantages of the change in environment, the trial court found that the magistrate's decision to maintain custody with Merry was not inappropriate. The magistrate and the trial court noted that the obvious goal of changing custody would be to improve the situation for Sabina; however, as the trial court noted in its decision, while Karam is a loving and competent parent, the court could not make the determination that the conflict between him and Merry would be lessened if he were to obtain custody, or that the stress from their conflict would be lessened upon Sabina.
This decision is supported by Mr. Galen's report and testimony which concluded that Sabina was under a great deal of emotional strain as a result of the conflict between her parents. Mr. Galen could not see how a change in custody would resolve such problems. In fact, in terms of Sabina's best interests, Mr. Galen noted grave concerns about how making such big changes in her life would negatively affect her.
The trial court also addressed this concern, concluding that "Sabina is a young child who has a strong bond with her mother, and that the harm of disrupting her life in Dayton and relocating her to California outweighs the benefits at this time." The magistrate noted that "uprooting" Sabina from Merry, her primary caregiver, and taking her from the only school she has ever known, to place her in a city that is a great distance away from her home in Dayton, would be more harmful than leaving her in what had been, to that point, a "poor environment." Moreover, the trial court stated that "[t]he results of all of the information provided to the court indicate that both parents are controlling and have attempted to involve or pressure Sabina. The collective evidence does not indicate clearly that a change in custody would alleviate the conflict for Sabina." (Doc. 182, p. 7)
Given Sabina's vulnerable psychological state as a result of the custody dispute between her parents, it was not unreasonable, arbitrary or capricious for the trial court to find that Karam had not proven, by a preponderance of the evidence, that the harm likely to be caused by a modification of custody would be outweighed by the advantages. The trial court did not err or abuse its discretion when it maintained custody and attempted to first treat the problem by ordering Merry to desist from using Sabina to retaliate against Karam.
Finally, we would like to note that we strongly agree with the trial court's determination to continue to monitor the family situation. We find it disconcerting that the parties' conflict has affected Sabina in this way. We agree that if Merry's behavior does not change regarding Karam's visitation and contact with Sabina, the trial court should consider a change of custody.
As such, the trial court did not err or abuse its discretion in its decision to maintain custody with Merry, as it did correctly consider all of the relevant factors. Karam's first, second, and fourth assignments of error are overruled.
III.
 The trial court erred as a matter of law when it based its decision not to change custody on a report by psychologist Dr. Hannah who was not only biased and unprofessional, but found incredible by the magistrate. Further, the trial court ignored the report of the psychologist recommended by Appellee even though the magistrate accepted this report to be credible.
In his third assignment of error, Karam argues that the trial court failed to give any deference to the magistrate by relying upon Dr. Hannah's report in its determination to maintain custody with Merry, because Dr. Hannah's report was biased against Karam and based upon unreliable test data. Furthermore, Karam argues that it did not consider Dr. Gardner's report in its decision on custody. We find no basis for these allegations and overrule this assignment of error.
Dr. Hannah interviewed, tested, and evaluated Merry, Karam and Sabina, and produced a report which was fairly negative towards Karam. Dr. Hannah testified that the standardized tests used to evaluate Karam had not been adjusted to accommodate for his Pakistani ethnicity. Additionally, Dr. Hannah's report also stated that Karam had suffered from a depressive disorder, had a paranoid predisposition, and had engaged in conduct designed to alienate Sabina from Merry. In part, Dr. Hannah based these diagnoses on Karam's beliefs that Merry had interfered with his telephone contact with Sabina, she was on a "rage of vindictiveness" to block visitation between Sabina and Karam, and that Merry had enrolled Sabina in a Christian school to spite him. However, both the magistrate and the trial court found Karam's beliefs to be justified.
The magistrate made the further determination that Dr. Hannah's clinical impressions were "distorted" by the test data and her apparent dislike of Karam's style during the evaluation process. Dr. Hannah's report, only with respect to Karam, was found to be incredible by the magistrate.
The credibility of Dr. Hannah and the weight to be given to her testimony was a matter for the trial court, as the trier of fact, to determine. State v. DeHass (1967), 10 Ohio St.2d 230. The trial court agreed with the magistrate that Dr. Hannah's report and recommendations were "suspect," given her conflict with Karam. However, it appears as though the trial court found some credibility in Dr. Hannah's testimony regarding Karam's behavior at the family counseling sessions. We cannot find that this was an abuse of discretion.
Furthermore, the trial court's decision to maintain custody did not rest on Dr. Hannah's evaluation of Karam as a more or less "suitable" parent. At most, the trial court weighed a portion of Dr. Hannah's report under the best interest analysis as a factor under R.C. 3109.04(F)(1)(e), dealing with the mental stability of the parties. Additionally, other evidence in the record exists supporting the trial court's decision to maintain Merry as the residential parent. There is evidence in the record that Merry had been a good mother to Sabina, they were well-bonded, and they have had a good relationship. Dr. Hannah concluded that Merry's actions were the result of "significant stress" she had been experiencing, and that her functioning would likely improve when her stress level was decreased.
As stated in the prior assignment of error, the trial court's decision to maintain custody was largely based on its concern that the harm of changing custody outweighed the advantages. Karam produced no evidence to the contrary. In fact, Mr. Galen's recommendation of maintaining Merry as the residential parent and legal custodian was based upon the fact that if custody were changed, no evidence existed that Sabina's situation would improve. As a result of the vast amount of evidence, the trial court correctly determined that it would be better to maintain the status quo and attempt to control the offending conduct of the parties by closely monitoring the situation.
Finally, the trial court did adopt the magistrate's decision and permanent order, with some modifications. In modifying the decision, the trial court did not address the credibility of Dr. Hannah's report specifically; thus, we infer that the trial court adopted the magistrate's findings with regard to Dr. Hannah's report.
For the above-mentioned reasons, we cannot find that the trial court based its decision solely on Dr. Hannah's report, nor can we find that the trial court ignored Dr. Gardner's report. Because of this, Karam's third assignment of error has no merit and is hereby overruled.
V.
 The trial court erred as a matter of law when it determined that a psychological evaluation could be performed in one year to verify that the child has suffered continued parental alienation by Appellee. The trial court specifically erred when it limited such psychologist or child specialist as one from the state of Ohio.
In this assignment of error, Karam argues that the trial court erred in determining that the child psychologist who evaluates Sabina after one year to determine if she still suffers from PAS should be located in Ohio. Karam offers no argument for how this prejudiced him. We fail to see how this order was an abuse of discretion or error on behalf of the trial court. Sabina resides in Ohio, and the Ohio court maintains its continuing jurisdiction over this case, thus it was neither error nor an abuse of discretion for the trial court to order the evaluation to be performed by an Ohio psychologist. Karam's fifth assignment of error is overruled.
VI.
 The trial court erred as a matter of law and abused its discretion when the trial court gave Appellee a stern warning over her behavior of intentionally interfering with the relationship between Appellant and daughter, determined that such behavior rose to the level of psychological and physical abuse, and then reduced Appellant's visitation both over the telephone and over the summer.
In his final assignment of error, Karam contends that his visitation was in essence "shortened" by the trial court granting five days of visitation to Merry during Karam's eight weeks of summer visitation, and that the trial court did not determine whether this reduction was in Sabina's best interests. Furthermore, Karam argues that his telephone contact, previously as frequent as five days a week, twice a day, was reduced to, at most, three times a week.
R.C. 3109.05.1(D)(1)-(15) sets forth the factors the trial court must consider when determining whether a modification of visitation would be in the best interest of the child. See Burikv. Johnson (Feb. 12, 1997), Pike App. No. 96CA570, unreported. As we previously noted in Brown v. Brown (Aug. 29, 1997), Montgomery App. No. 16039, unreported, "[i]n modifying visitation, the trial court must consider the best interests of the child, but the court has broad discretion in this regard, so long as its orders are `just and reasonable.' * * * We review such a decision for an abuse of discretion." (Citations omitted.) The trial court enjoys broad discretion in applying these factors to the facts of each case, but the trial court must apply the factors as a matter of law. See R.C. 3109.05.1(D). R.C. 3109.05.1 does not require the plaintiff to present proof of a change in circumstances as a prerequisite to modifying a visitation order.Burik, supra.
In this case, the previous visitation order, filed on June 17, 1997, allowed Merry forty-eight hours of visitation during Karam's visitation with Sabina in California. This forty-eight hour period did not count toward Karam's visitation time. The trial court did in effect modify the existing visitation of Karam and shorten it by five days. Although it might be "just and reasonable," the trial court failed to apply the factors under R.C. 3109.05.1(D). Because of this, we find that the trial court erred, as a matter of law by not considering the above-mentioned factors. We hereby reverse the decision of the trial court and remand this cause to the trial court to decide whether, pursuant to R.C. 3109.05.1, it should modify its original visitation order.
The second portion of this assignment of error addresses the order of the trial court establishing set times for which Karam's telephone contact with Sabina would occur. Karam argues that where he used to have liberal phone contact with Sabina, the trial court has now limited this contact to having, at most, telephone contact three times a week. However, we do not find error in the trial court's order establishing set times for this contact to occur. Mr. Galen recommended a reduction of telephone contact. After witnessing a telephone conversation between Sabina and Karam, Mr. Galen noted that Sabina did not have much to say to Karam, having spoken with her father on a daily basis. Mr. Galen felt that this added to Karam's frustration regarding the visitation issues. He concluded that Karam might not experience such frustration by enjoying more "quality" telephone contact with Sabina which occurred on a less frequent basis.
Additionally, the trial court's order clarifies the magistrate's order by establishing set times for the telephone contact to occur on Tuesday and Thursday evenings, and on the Sundays during which Karam does not have visitation. This assures that Sabina will be at home awaiting his calls during that time. Given the history of these parties and the problems with visitation, this assures Karam that he will speak with Sabina at least twice a week. As such, we find no error in the trial court's clarification of the telephone contact provision.
Karam's sixth assignment of error is sustained in part and overruled in part. We reverse the trial court's order granting Merry five days of visitation over the summer, and remand the case to the trial court to determine if, pursuant to R.C. 3109.05.1, it is in Sabina's best interests to modify the prior visitation order.
We will affirm the trial court's judgment on all matters, with the exception of the above-mentioned visitation order, which is hereby remanded for further consideration consistent with this opinion.
WOLFF, J., concurs.
[1] In Dr. Gardner's book, Parental AlienationSyndrome, he asserts three classifications of PAS, depending upon severity. The most serious is "Severe," the middle category is "Moderate," and the lowest level of severity is "Mild."